IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| V. | ) | CR 05-137 |
| | ) | |
| DOMINGO GONZALEZ | ) | |

MEMORANDUM IN AID OF SENTENCING

The defendant, Domingo Gonzalez(Gonzalez), raises three objections to the Presentence Investigation Report (PSR): 1) a two-level increase for obstruction of justice; 2) enhancements for acquitted conduct (drugs and gun); and 3)defendant's role in the offense. In addition, defendant seeks a downward departure from the guidelines based on his status as an alien. For the reasons set forth below, the government believes that defendant's offense level was correctly calculated in the PSR and the defendant should be sentenced to a term of incarceration at the low-end of the guidelines range.

## A. OBJECTIONS TO THE PRESENTENCE REPORT

1. Defendant Testified Falsely at Trial

Section 3C1.1 of the Sentencing Guidelines provides, in part:

> If (A) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the ... prosecution, or sentencing of the instant offense of conviction, and (B) the obstructive conduct related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) a closely related offense, increase the offense level by **2** levels.

Application Note 1 of this section states:

> This adjustment applies if the defendant's obstructive conduct (A) occurred during the course of the investigation, prosecution, or sentencing of the defendant's instant offense of conviction, and (B) related to (i) the defendant's offense of conviction and any relevant conduct; or (ii) an otherwise closely related case, such as that of a co-defendant.

"Committing, suborning, or attempting to suborn perjury" is an example of obstructive conduct under the guidelines. U.S.S.G. § 3C1.1 n.4.

A defendant who perjures himself at trial is properly subject under the Sentencing Guidelines to an enhancement for obstruction of justice. United States v. Dunnigan, 507 U.S. 87, 98, 113 S.Ct. 1111, 1119 (1993). To impose an obstruction of justice enhancement predicated upon perjury, the Court must find that the defendant gave "false testimony concerning a material matter with the willful intent to provide false testimony rather than as a result of confusion, mistake, or faulty memory." United States v. McKeeve, 131 F.3d 1, 15 (1st Cir. 1997) (quoting United States v. Dunnigan, 507 U.S. at 94, 113 S. Ct. at 1116); United States v. D'Andrea, 107 F.3d 949, 958 (1st Cir. 1997). The Court's findings must encompass all the elements of perjury - falsity, materiality, and willfulness. United States v. Matiz, 14 F.3d 79, 84 (1st Cir. 1994). The constitutional right to testify in one's own defense does not include a right to commit perjury. United States v. Dunnigan, 507 U.S. at 96, 113 S. Ct at 1117.

In the instant case, the Court need not look far to conclude that a two-level enhancement for obstruction of justice is warranted. At trial, Gonzalez testified as follows:

1. Up to a month before his arrest, Gonzalez resided in Lawrence, Massachusetts, at his mother’s house. He had lived there for the past 9.5 years and graduated from Lawrence High

School. Prior to his arrest, he was employed as an assistant installer at Direct TV and then at Big Sky T.V.. Defendant owned a vehicle that he used for work.

2. In November of 2005, defendant went to Georgia to work. Defendant took his vehicle with him. The week prior to his arrest, Defendant returned to Massachusetts in order to visit with his daughter and his daughter's mother. During this time, defendant stayed at his mother's house.

3. Defendant knew Christopher Garcia for five to six years. Defendant saw Garcia often and knew that he worked at a "bodega." Defendant knew Alejandro Pujols. He met Pujols approximately 10 months prior to their arrest. Pujols and the defendant used to meet at a mutual friend's house where they played dominos. He knew that Pujols did not reside in Massachusetts.

4. On December 10, 2005, the night prior to their arrest, defendant met Pujols at a friend's house. They played dominos together. Pujols mentioned that he was driving to Rhode Island the following day and asked the defendant to go with him. Pujols told Christopher Garcia to pick up the defendant and drive him to Rhode Island.

5. Defendant wanted to go to Rhode Island because he wanted to visit his sister in Central Falls. This was the first time he'd been to Providence in two years. Defendant did not make any specific plans to see his sister in advance.

6. On the morning of December 11, 2005, Garcia picked up the defendant and drove with him to Rhode Island. Defendant admitted that he placed at least one call to Pujols that morning. Defendant stated that once in Providence, Pujols met the defendant and Garcia in his car. Pujols signaled to them to follow Pujols.

7. Defendant and Garcia followed Pujols to a house near Elmwood Avenue. He had

never been to that house before. Defendant and Garcia parked the car in the driveway. Defendant did not turn around in his seat to face the back passenger seat before exiting his vehicle. Defendant and Garcia met Pujols and a man he later learned was Waska Pena outside the house. They walked in together.

8. Defendant did not know why they were at the house. He didn't know anyone other than Garcia and Pujols. Garcia and Pujols went with Pena to the basement because Pena wanted to show them how he was fixing it. Defendant went to the living room.

9. When he was in the living room, defendant heard someone break open the door. Defendant decided to run to the basement. When he was in the basement, defendant saw Pujols and Garcia trying to hide. They told him to hide as well. Defendant went into another room to hide. Defendant hid under some garbage for about ten minutes prior to being arrested. He had his phone on him the entire time.

10. Defendant denied participating in any drug transaction with Pena or knowing that any drugs were present.

In addition, on cross examination, the defendant admitted that he understands some English. Defendant denied hearing the police announce themselves upon entry. Defendant didn't attempt to exit the house when he heard the commotion. He ran to the basement.

Gonzalez's account of (1) his telephone conversations with Pujols; (2) the purpose of his trip to Providence; (3) why he was at Pena's house; (4) how he came to be in the basement, and specifically in the very room where there was a kilogram of cocaine; and (5) his denial of involvement in any drug transaction, is contradicted by the physical evidence introduced at trial, the testimony of the agents executing the search warrant, the expert opinion of Special Agent

James McCormick, and common sense.

Gonzalez's account was clearly limited by evidence that he could not refute: the government introduced toll records that showed Gonzalez and Pujols communicated with each other on December 10 and 11 just prior to the ill-fated drug deal. Gonzalez, therefore, could not deny knowing or speaking to Pujols. Gonzalez was seen in the car with Christopher Garcia – he could not deny knowing Garcia. Gonzalez was found in the basement of Pena's house, accordingly, he could not deny being there. So, Gonzalez had to come up with a plausible explanation for how he happened to be in the wrong place at the wrong time. His explanation is illogical and strains credulity.

First, it makes no sense that Gonzalez, on that day, decided to visit his sister in Central Falls, without any prior arrangement with her. He drove from Lawrence to Providence, passing Central Falls on the way, but he was not dropped off by Garcia. Gonzalez's sister, who testified at trial, said nothing about any planned visit by her brother that day. Indeed, she testified that the last time she saw him was in September of 2005.

Second, Gonzalez's testimony regarding his telephone communications with Pujols –- which he sought to portray as innocent conversations regarding a trip of an unspecified purpose to Providence -- coincided directly with intercepted conversations between Pena and Pujols setting up this drug deal. As the government showed at trial, on December 10, 2005, Pena called Pujols at 16:14 hours to ask about the impending delivery. Pujols stated to Pena that Pujols was on his way to Lawrence, Massachusetts, and that he was going to call his drug connection there. Between 19:39 hours and 20:32 hours, there were three calls between Gonzalez and Pujols. At 20:39 hours, Pujols called Pena and told him that "there is a positive thing around here." As

Special Agent Anthony Cardello testified, "positive," was a code word used to describe the availability of drugs. Twenty minutes later, there were two calls between Gonzalez and Pujols. Three hours later, Pujols called Pena to inform him that "we'll be there" the next morning.

On December 11, 2005, toll records indicate that Pujols called Gonzalez at 11:19 a.m.. About four minutes later, Pujols called Pena and informed him that "I'm going to give you three," meaning three kilograms of cocaine. Between 11:27 and 12:52, there were three completed calls between Gonzalez and Pujols. At 14:05, there was a call between Pena and Pujols where Pujols instructed Pena to be ready with the money ("tickets") "so those people can leave . . . at once." Between 15:11 and 15:41, there were three calls between Pujols and Gonzalez. During the same time-frame, calls were intercepted between Pena and his customer, Cornelio Ozorio, in which Pena told Ozorio to be ready with the money because the cocaine was on its way. The frequency of the calls between the defendant and Pujols, together with the timing of those calls relative to intercepted calls between Pena, Pujols, and Ozorio, point to only one conclusion: the conversations between the defendant and Pujols were in furtherance of the drug conspiracy, and not for any other reason.

Third, Gonzalez's testimony that he did not turn around in his seat prior to exiting the car was directly contradicted by the testimony of Providence Police Detective Joseph Colanduano. Det. Colanduano testified that from his unobstructed surveillance position, he clearly observed the driver and the passenger turn around in their seats before exiting the vehicle. While Det. Colanduano candidly admitted that he did not see what they were doing, it became clear, after the arrest, that they were removing items from a hidden compartment behind the front passenger seat. Fourth, Gonzalez testified that he entered Pena's house never having met Pena

previously, and not knowing the purpose of the visit. It defies common sense to believe that Pena, who was about to engage in a $40,000 drug transaction, would let an unknown, uninvolved, innocent bystander hang out at his house while the transaction was taking place. Why not just leave him in the car? Special Agent James McCormick also testified that drug dealers limit their exposure to only those individuals who must be involved in the deal. It simply makes no sense for Gonzalez to be present at the house, unless he was part of the deal.

Fifth, Gonzalez's account of running to the basement just as the police were entering the house is completely unbelievable. At trial, a sketch of Pena's house and testimony by the agents executing the search warrant made it clear that, in order to get to the basement, defendant had to run back toward the side door (where the police made entry) and descend a flight of stairs. In other words, defendant ran toward the commotion he heard; toward the police. Defendant somehow managed to do this unseen by the police who entered after a couple of seconds. Furthermore, Gonzalez claimed that he didn't know who was breaking in. Yet, the police testified that they yelled loudly "Police, Police" upon entry. Why would Gonzalez run toward the basement, having heard that. Even if he didn't know that police were breaking in, why would he run toward the source of the commotion. It simply makes no sense. Rather, the defendant was already in the basement when the police entered the house.

Finally, Gonzalez claims that he just happened to hide in the room where the cut kilogram of cocaine and heat sealer were found. Again, Gonzalez would have the jury, and now the Court, believe that he is an extremely unlucky individual. How would Gonzalez have time to figure out which room in the basement to go to, cover himself with a rug and garbage, all before the police made their way downstairs. Isn't the more obvious scenario that Gonzalez was already in that

room when the police broke into the house, and, in his panic, found the closest place to hide?

Defendant's testimony was untruthful, it was material, and it was deliberately calculated to explain away defendant's involvement in a multi-kilo drug deal. The testimony was rejected by the jury. Accordingly, a two-level increase is appropriate.

2. The Drugs and Gun Were Properly Considered in Calculating the Offense Level

______*A. Acquitted Conduct May be Considered by the Court*

"'Relevant conduct is not limited to the counts of conviction;' rather, it includes both the charged conduct to which a defendant pleads and also any other conduct that qualifies under the relevancy rubric." United States v. Graciani, 61 F.3d at 74 (quoting United States v. Tejada-Beltran, 50 F.3d at 110); United States v. Caba, 241 F.3d 98, 102 (1st Cir. 2001). The court need only make relevant conduct findings based on the preponderance of the evidence. United States v. Conley, 156 F.3d 78, 85 (1st Cir. 1998). Under the guidelines, a sentencing court may consider "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity," USSG § 1B1.3(a)(1)(B), and may consider the "same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G § 1B1.3(a)(2). In the commentary to this section, the Guidelines specifically indicate that "in a drug distribution case, quantities and types of drugs not specified in the count of conviction are to be included in determining the offense level if they were part of the same course of conduct . . ." Id. (comment. backg.)

In United States v. Watts, 519 U.S. 148, 157 (1997), the Supreme Court unequivocally announced that "a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by

a preponderance of the evidence." In the companion case to Watt, the Supreme Court held that the district court correctly added the drug amounts from a count on which the defendant was acquitted to drug amounts from the counts of conviction in calculating the appropriate guidelines range. Id. Similarly, in Caba, the First Circuit upheld the district court's inclusion of the quantity of crack cocaine from a count on which the defendant was acquitted. Id. at 101. See also, United States v. Reyes-Echevarria, 345 F.3d 1, 7 (1st Cir. 2003) (same).

The defendant's reliance on Judge Gertner's decision in United States v. Pimental, 367 F. Supp.2d 143 (D. Mass. 2005) is unpersuasive. As the Court stated in United States v. Edwards, 427 F. Supp.2d 17 (D.D.C. 2006):

> Every federal circuit that has addressed post-Booker the issue of sentencing enhancements based on judge-found facts regarding acquitted conduct has concluded that such enhancements do not violate the Sixth Amendment right to a jury trial so long as the sentence is within the statutory range authorized by the jury's verdict the lynchpin of Booker itself. See United States v. Vaughn, 430 F.3d 518, 527 (2d Cir.2005)("district courts may find facts relevant to a sentencing by a preponderance of the evidence, even where the jury acquitted the defendant of that conduct, as long as the judge does not impose (1) a sentence in the belief that the Guidelines are mandatory, (2) a sentence that exceeds the statutory maximum authorized by the jury's verdict, or (3) a mandatory minimum sentence under 21 U.S.C. § 841(b) not authorized by the jury verdict"); United States v. Price,418 F.3d 771, 777-78 (7th Cir.2005) (rejecting claim that enhancement based on acquitted conduct violated the Sixth Amendment); United States v. Magallanez, 408 F.3d 672, 685 (10th Cir.2005) ("we conclude that when a district court makes a determination of sentencing facts by a preponderance test under the ***25** now-advisory Guidelines, it is not bound by jury determinations [of acquittal] reached through application of the more onerous reasonable doubt standard"); United States v. Duncan, 400 F.3d 1297, 1304- 05 (11th Cir.2005) ("Booker does not suggest that the consideration of acquitted conduct violates the Sixth Amendment as long as the judge does not impose a sentence that exceeds what is authorized by the jury verdict"). Each of these courts also has concluded that the logic of Watts continues to apply after Booker--*i.e.,* that enhancements based on acquitted conduct

> do not conflict with a jury verdict of acquittal--and that Watts is persuasive authority as to whether sentencing enhancements for acquitted conduct comport with the Sixth Amendment. See, e.g., Vaughn, 430 F.3d at 525-26; Price, 418 F.3d at 787-88; Magallanez, 408 F.3d at 684; Duncan, 400 F.3d at 1304.

Although the First Circuit has not spoken directly about the use of acquitted conduct at sentencing since Booker, there is little doubt that it will reach the same conclusion as the Second, Seventh, Tenth and Eleventh Circuits. The First Circuit has repeatedly stated post-Booker, that factors relevant to the sentence may still be found by the Judge by a preponderance of the evidence. See, e.g. United States v. Antonakopoulos, 399 F.3d 68, 75 (1st Cir. 2005) ("As we have explained, the error under United States v. Booker is not that a judge (by a preponderance of the evidence) determined facts under the Guidelines which increased a sentence beyond that authorized by the jury verdict or an admission by the defendant; the error is only that the judge did so in a mandatory Guidelines system") (emphasis added).

*B. Firearms Enhancement was Proper*

An enhancement under 2D1.1(b)(1) is proper where a firearm is present during the course of a drug conspiracy, as was proven in this case, even though the defendant himself did not posses the firearm. In United States v. Berrios, 132 F.3rd 834 (1st Cir. 1998), the First Circuit upheld a firearms enhancement under U.S.S.G. § 2D1.1(b)(1) where the defendant never possessed the gun and was arrested at a different location from where the gun was found. The Court stated that "the evidence showed that [the defendant] was seen exiting the residence where the gun was found, that he had made many calls to this residence, that the residents were coconspirators, and that the residence was a center for the drug operation. These facts are

sufficient for the enhancement because the sentencing guidelines require only that a gun be present during some portion of an ongoing crime." Id. (emphasis added.) The Court stated that:

> once the presence of a weapon is established enhancement is proper unless the defendant demonstrates special circumstances that show a clear improbability that the weapon was connected to the drug offense. U.S. v. Lagasse, 87 F.3d 18, 22 (1st Cir. 1996). The government offered proof that the gun was present during the drug conspiracy, and the defendant did not offer any special circumstances that would make the connection between the gun and the crime improbable; therefore, the enhancement was proper.

Similarly, in United States v. Casas, 356 F.3d 104 (1st Cir. 2004), the Court upheld a dangerous weapons enhancement in the drug-trafficking context, holding that the enhancement requires only "that it was reasonably foreseeable that a co-conspirator would possess a gun in furtherance of the criminal activity. United States v. Mena-Robles, 4 F.3d 1026, 1036 (1st Cir. 1993). The defendant need not have himself possessed the weapon." Cf. United States v. Sostre, 967 F.2d 728, 731-32 (1st Cir.1992) (enhancement affirmed where co-defendant physically possessed gun and defendant assisted him in protecting drugs).

In this case, a preponderance of the evidence fairly supports the dangerous weapon enhancement. The defendant was convicted of conspiracy to distribute over 500 grams of cocaine. The evidence showed that the defendant was deeply involved in this drug conspiracy, indeed that he was the likely source of the drugs. The defendant admitted that he knew Christopher Garcia for many years and was friendly with him. The defendant and Garcia drove to Providence in a vehicle, registered to Garcia, that was designed to carry contraband such as guns and drugs, as evidenced by the presence of a hydraulic hidden compartment. This compartment was large enough to contain, not only the 96 grams of cocaine and the handgun

present inside, but also the other two kilograms of cocaine seized. Furthermore, Det. Colanduano testified that he saw the defendant and Garcia turn around inside the vehicle, toward the back seat, prior to exiting the car. Finally, given the fact that courts have repeatedly recognized that guns are tools of the trade of drug dealers, it is perfectly reasonable to conclude that Gonzalez and Garcia had the firearm to protect themselves, the drugs, and the proceeds. Thus, at the very least, the presence of a firearm was entirely foreseeable to Gonzalez.[1]

Defendant cannot, and has not, shown any special circumstances why this gun was not connected to the offense. The gun was loaded, adjacent to drugs, in a car that was used to deliver drugs. A closer connection is difficult to imagine.

For the same reason, the government submits that the PSR correctly included the 96 grams of cocaine that was found in the hidden compartment. The presence of these additional drugs was, if not directly known by the defendant, easily foreseeable by him as he was the one who chose co-defendant Garcia to drive him down to Providence for the purpose of conducting a drug transaction.

3. Defendant was not a Minor Participant

Section 3B1.2 of the Sentencing Guidelines provides "a range of adjustments for a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant." U.S.S.G. § 3B1.2, comment n. 3(A). A minor participant is one who is "less culpable than most other participants, but whose role could not be described as

[1] It should be noted that Garcia admitted at his change of plea hearing that both he and Gonzalez knew of the drugs and gun in the hidden compartment.

minimal." U.S.S.G. § 3B1.2, comment n. 5. As the commentary to this guideline suggests, and as the First Circuit has explained, a downward adjustment for mitigating role involves a bifocal analysis: "Role in the offense adjustments depends . . . not only on the comparative conduct of persons jointly engaged in criminal activity, but also on comparing each offender's actions and relative culpability with the elements of the offense." United States v. Nunez-Rodriguez, 92 F.3d 14, 24 (1st Cir. 1996)(citing United States v. Gregorio, 956 F.2d 341, 344 (1st Cir. 1992)); see also United States v. Brandon, 17 F.3d 409, 460 (1st Cir.), cert. denied, 513 U.S. 820 (1994).

As a matter of course, defendant has the burden of proving his entitlement to a downward adjustment under § 3B1.2. United States v. Ocasio, 914 F.2d 330, 332 (1st Cir. 1990). It is well settled that no defendant is automatically entitled to a role-in-the-offense reduction, even if the evidence indicates that he is less culpable than other participants. Brandon, 17 F.3d at 460. The district court has broad discretion in deciding whether or not to award a downward adjustment for role in the offense and it is not obligated to do so. United States v. Lopez-Gil, 965 F.2d 1124, 1131 (1st Cir. 1992), cert. denied 113 S. Ct. 484 (1992); Brandon, 17 F.3d at 460.

In this case, the defendant would like to portray himself as merely a courier. The evidence suggests otherwise. As already elaborated upon above, defendant had numerous phone conversations with Pujols on the day prior to the drug deal and earlier that day. Intercepted conversations between Pujols and Pena show that (1) the drugs were coming from Lawrence, (2) the availability of drugs was dependent on what the people from Lawrence could bring (hence the reduction from three to two kilos);(3) the timing of deal was dependent on Gonzalez and Garcia; and (4) Gonzalez and Garcia were to be paid at once. In addition, Gonzalez and Garcia brought the drugs in a car registered to Garcia that was specially designed to carry contraband. This

suggests prior involvement in drug trafficking activities. They were present in the basement when the drugs were cut, tested, and then delivered to Ozorio. According to the expert testimony of Special Agent McCormick, drug dealers minimize their contacts with other participants in the drug trade. It is unlikely that a mere courier would be invited to remain in the basement to witness this transaction.

Even if defendant's role was "limited to transporting or storing drugs," that would not entitle defendant to an adjustment under this guideline. See United States v. Lopez-Gil, 965 F.2d 1124, 1131 (1st Cir. 1992) ("a drug courier is not entitled as of right to a reduction of the offense level as a minimal or minor participant"); United States v. Cepeda, 907 F.2d 11, 12 (1st Cir. 1990) (drug courier who is only charged with one count of a four count indictment for the transaction for which he was convicted was not entitled to adjustment for minor or minimal role in the offense); United States v. Paz Uribe, 891 F.2d 396, 399 (1st Cir. 1989), cert. denied, 495 U.S. 951 (1990) ("even if the court found that Paz was only a courier, he would not automatically be entitled to a reduction"); see also, United States v. Caballero, 936 F.2d 1292, 1299 (D.C. Cir. 1991) ("We disagree that Caballero's status as a courier, by itself, is enough to support a finding that he was a minor participant. . . . a courier can play as active and culpable a part in a drug offense as another participant, whether or not that participant is another courier"); United States v. Wright, 873 F.2d 437, 443-44 (1st Cir, 1989); See also, United States v. Coneo-Guerrero, 148 F.3d 44, 50 (1st Cir. 1998) (transporters of cocaine not less responsible than other unnamed participants).

**B. DEFENDANT IS NOT ENTITLED TO A DOWNWARD DEPARTURE**

In a separate downward departure motion, defendant asks the court to depart because the defendant will be facing deportation after incarceration.[2] Prior to Booker, the prospect of deportation of the defendant was generally a forbidden factor for downward departure. See, e.g., United States v. Maldonado, 242 F.3d 1 (2001) ("In short, a deportable alien who commits a crime is still within the "heartland" of the guidelines, absent something more." See also, United States v. Vasquez, 279 F.3d 77, 81 (1st Cir.2002) (the adverse consequence of deportation to an alien defendant is not a permissible basis for departure). Although the guidelines are no longer mandatory, a reasonableness analysis under 18 U.S.C. § 3553(a) still begins with the guidelines, as the First Circuit has stated in United States v. Jimenez-Beltre, 440 F.3rd 514 (1st Cir. 2006)("the guidelines cannot be called just "another factor" in the statutory list, because they are the only *integration* of the *multiple* factors and, with important exceptions, their calculations were based upon the actual sentences of many judges"). Indeed, one of the departure factors considered, and rejected, in Jimenez-Beltre, was defendant's deportability.

In this case, defendant has not shown why his future deportation renders the term of incarceration unreasonable, or places him outside the heartland of cases. Indeed, the sentencing disparity that could result by sentencing the defendant to a term below the guidelines range simply because he will be deported contravenes one of the factors of 18 U.S.C. § 3553(a). In this

[2]Defendant also mentions his age and the fact that he has no criminal history points. Defendant's age appears to be wholly irrelevant to the sentencing analysis. Defendant's criminal history was already taken into consideration in calculating his guidelines range.

case, such a departure would not only lead to a hypothetical disparity, but an actual one. Three of Gonzalez's co-defendants are also deportable aliens. The court did not consider that fact as a basis for departure from the guidelines in their cases.

## CONCLUSION

For the reasons set forth above, the government respectfully requests that the Defendant's Objection to the PSR and Motion for Downward Departure be denied.

Respectfully submitted,
UNITED STATES OF AMERICA

By its Attorneys,
ROBERT CLARK CORRENTE
United States Attorney

/s/Adi Goldstein
ADI GOLDSTEIN #6701
Assistant U.S. Attorney
U.S. Attorney's Office
50 Kennedy Plaza, 8th Floor
Providence, RI 02903
(401) 709-5000

CERTIFICATION

I Hereby certify that on this 14th day of December, 2006, I did send a true copy of the within document by electronic means to Robert B. Mann, counsel for defendant Domingo Gonzalez.

/s/Adi Goldstein

ADI GOLDSTEIN #6701
Assistant U.S. Attorney
U.S. Attorney's Office
50 Kennedy Plaza, 8th Floor
Providence, RI 02903
(401) 709-5000