UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

```
_____
                                    )
UNITED STATES OF AMERICA,           )
                                    )
        v.                          )
                                    )    CR. No. 05-137-S
                                    )
DOMINGO GONZALEZ.                   )
                                    )
_____)
```

**MEMORANDUM AND ORDER**

WILLIAM E. SMITH, Chief Judge.

Domingo Gonzales has filed a Motion to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody (the "Motion") (ECF No. 203) pursuant to 28 U.S.C. § 2255.[1] No hearing is necessary.[2] For the reasons stated below, the Motion is DENIED and DISMISSED.

---

[1] Included in Gonzalez's Motion is a request to proceed <u>in forma pauperis</u>. (Motion to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody (the "Motion") 14-15, ECF No. 203.) As there is no filing fee for a motion brought under § 2255, that request is denied.

[2] Although Gonzalez requests an evidentiary hearing, a defendant is not entitled to an evidentiary hearing in a § 2255 proceeding as a matter of right. <u>David v. United States</u>, 134 F.3d 470, 477 (1st Cir. 1998) (citing <u>United States v. McGill</u>, 11 F.3d 223, 225 (1st Cir. 1993)). The Court of Appeals for the First Circuit has stated that, even if requested, a hearing is unnecessary when a § 2255 motion is "inadequate on its face . . . the movant's allegations, even if true, do not entitle him to relief, or . . . the movant's allegations 'need not be accepted as true because they state conclusions instead of facts, contradict the record, or are inherently incredible.'" <u>Id.</u> (quoting <u>McGill</u>, 11 F.3d at 225-26); <u>see also United States</u>

I.  Background[3]

This case arises out of a drug transaction involving Gonzalez and five other men.  On December 14, 2005, after a drug-trafficking investigation jointly conducted by the United States Drug Enforcement Agency ("DEA") and various Rhode Island law enforcement agencies, Gonzalez and five co-defendants were indicted for a number of drug-related offenses.  Specifically, Gonzalez was charged with conspiracy to distribute and to possess with intent to distribute 500 grams or more of cocaine (Count I); possession with intent to distribute 500 grams or more of cocaine (Count II); possession with intent to distribute an unspecified quantity of cocaine (Count IV); and possession of a firearm in furtherance of a drug trafficking crime (Count V). He was not charged in Count III.

_____

v. Mosquera, 845 F.2d 1122, 1124 (1st Cir. 1988) ("Generally, when a court disposes of a § 2255 petition without a hearing, allegations must be accepted as true except to the extent they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact.").  It is the defendant/petitioner's burden to establish the need for an evidentiary hearing.  McGill, 11 F.3d at 225.  Here, Gonzalez has not met his burden of showing that his allegations need not be accepted as true because they state conclusions instead of facts and/or are contradicted by the record.  Thus, an evidentiary hearing is unnecessary.

[3] The facts are taken primarily from the First Circuit's opinion in United States v. Gonzalez, 570 F.3d 16 (1st Cir. 2009).  That opinion contains a lengthy description of the events leading up to Gonzalez's arrest, which this Court need not repeat.

Gonzalez's co-defendants pled guilty before trial. On April 24, 2006, after a four-day jury trial, Gonzalez was convicted on Counts I and II, but acquitted on Counts IV and V. On March 6, 2007, Gonzalez was sentenced to 121 months incarceration on each count, to be served concurrently, followed by five years of supervised release.

Gonzalez appealed his conviction to the Court of Appeals for the First Circuit. The First Circuit affirmed the conviction in an opinion dated June 24, 2009. United States v. Gonzalez, 570 F.3d 16 (1st Cir. 2009). Thereafter, Gonzalez timely filed the instant Motion.

II. Discussion

Generally, the grounds justifying relief under § 2255[4] are limited. A court may grant relief pursuant to § 2255 in instances where the court finds a lack of jurisdiction, a constitutional error, or a fundamental error of law. See United

_____

[4] Title 28 U.S.C. § 2255 provides in pertinent part:

A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255(a).

3

States v. Addonizio, 442 U.S. 178, 185 (1979). "[A]n error of law does not provide a basis for collateral attack unless the claimed error constituted a fundamental defect which inherently results in a complete miscarriage of justice." Id. at 185 (internal citation omitted).

Gonzalez raises four grounds for relief under § 2255. First, he alleges that his trial counsel was ineffective because counsel had an undisclosed conflict of interest, thereby violating Gonzalez's Sixth Amendment right to effective assistance of counsel. Second, Gonzalez contends that the Government knowingly or unknowingly used false evidence at his trial, in violation of his due process rights. Third, Gonzalez again claims that his trial counsel was ineffective for failing to investigate the allegedly false evidence and certain wiretaps and phone calls. Finally, Gonzalez asserts that there was insufficient evidence presented at trial to convict him.

A. Ineffective Assistance of Counsel Claims

"The Sixth Amendment guarantees criminal defendants the right to effective assistance of counsel." Lema v. United States, 987 F.2d 48, 51 (1st Cir. 1993) (citing Strickland v. Washington, 466 U.S. 668, 687 (1984)). However, "[t]he Constitution does not guarantee a defendant a letter-perfect defense or a successful defense; rather, the performance standard is that of reasonably effective assistance under the

4

circumstances then obtaining." <u>United States v. Natanel</u>, 938
F.2d 302, 309-10 (1st Cir. 1991).

A defendant who claims that he was deprived of his Sixth
Amendment right to effective assistance of counsel must
demonstrate:

(1) that his counsel's performance fell below an objective
standard of reasonableness; and
(2) a reasonable probability that, but for counsel's
unprofessional errors, the result of the proceeding
would have been different.

<u>Strickland v. Washington</u>, 466 U.S. at 687-88, 694; accord <u>United
States v. Manon</u>, 608 F.3d 126, 131 (1st Cir. 2010). In
assessing the adequacy of counsel's performance, a defendant
"'must identify the acts or omissions of counsel that are
alleged not to have been the result of reasonable professional
judgment,' and the court then determines whether, in the
particular context, the identified conduct or inaction was
'outside the wide range of professionally competent
assistance.'" <u>Manon</u>, 608 F.3d at 131 (quoting <u>Strickland</u>, 466
U.S. at 690). With respect to the prejudice requirement under
<u>Strickland</u>, a "reasonable probability is one sufficient to
undermine confidence in the outcome. . . . In making the
prejudice assessment, [the court] focus[es] on the fundamental
fairness of the proceeding." <u>Id.</u> (internal citations and
quotation marks omitted). "Unless a defendant makes both
showings, it cannot be said that the conviction . . . resulted

from a breakdown in the adversary process that renders the result unreliable." Strickland, 466 U.S. at 687; see also Reyes-Vejerano v. United States, 117 F. Supp. 2d 103, 107 (D.P.R. 2000) ("The petitioner has the burden of proving both prongs of this test, and the burden is a heavy one.").

Strickland instructs that "[j]udicial scrutiny of counsel's performance must be highly deferential." Id. at 689; see also id. ("It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."). The court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)). Moreover, "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." Id. at 691. Finally, "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to

evaluate the conduct from counsel's perspective at the time."
Id. at 689.

Gonzalez makes essentially two arguments in support of his claim that his trial counsel, Robert B. Mann, provided ineffective assistance. First, he alleges that counsel had an undisclosed actual conflict of interest which prejudiced Gonzalez's case.[5] (Mot. 5.) Second, he asserts that counsel failed to investigate allegedly false testimony and wiretap evidence. (Id. at 7-8.)

The Supreme Court noted in Strickland that "counsel owes the client a duty of loyalty, a duty to avoid conflicts of interest." 466 U.S. at 688 (citing Cuyler v. Sullivan, 446 U.S. 335, 346 (1980)[6]). However, there is no per se rule of prejudice

---

[5] Gonzalez states that after his sentencing, counsel disclosed that he had previously represented Lisa Torres and stated that "any arguments that he raised with respect to her would be a conflict." (Gonzalez Aff. ¶ 6.) According to Gonzalez, he "continued to insist that [counsel] use wiretap evidence to exculpate [him] but that would incriminate Ms. Torres." (Id. at ¶ 7.) Instead, counsel withdrew as his appellate attorney. (Id.)

[6] Sullivan dealt with multiple, or concurrent, representation, Strickland v. Washington, 466 U.S. 668, 698 (1984); Cuyler v. Sullivan, 446 U.S. 335, 347 (1980), not subsequent representation, Mickens v. Taylor, 535 U.S. 162, 175-76 (2002). Gonzalez contends that the same arguments should apply to both concurrent and subsequent representation. (Gonzalez Mem. 19-21 (citing United States v. Agosto, 675 F.2d 965, 970-71 (8th Cir. 1982)).) The Mickens decision does not support Gonzalez's interpretation. See 535 U.S. at 176 ("In resolving this case . . ., we do not rule upon the need for the Sullivan prophylaxis in cases of successive representation.

in such cases.  <u>Id.</u> at 692.  Rather, "[p]rejudice is presumed

only if the defendant demonstrates that counsel 'actively

represented conflicting interests' and that 'an actual conflict

of interest adversely affected his lawyer's performance.'"  <u>Id.</u>

(quoting <u>Sullivan</u>, 446 U.S. at 350); <u>see also</u> <u>Mickens</u>, 535 U.S.

at 171, 173-74 (emphasizing that an actual conflict of interest

does not result in an automatic reversal; in almost all cases,

some showing of an adverse effect is still required).

"[T]he possibility of conflict is insufficient to impugn a

criminal conviction.  In order to demonstrate a violation of his

Sixth Amendment rights, a defendant must establish that an

---

Whether <u>Sullivan</u> should be extended to such cases remains, as
far as the jurisprudence of this Court is concerned, an open
question."); <u>Taillon v. United States</u>, No. 11-cv-470-SM, 2013 WL
2107509, at *6 n.3 (D.N.H. May 15, 2013) ("It remains an open
question as to whether the actual conflict standard applies in
the circumstances of successive representation." (citing <u>United
States v. DeCologero</u>, 530 F.3d 36, 77 n.24 (1st Cir. 2008))).
    Gonzalez further states that "the rule is that once a court
is apprised of the potential conflict, that there must be some
sort of on-the-record inquiry.  In this case Petitioner was not
afford[ed] his due process to have this critical inquiry by the
court." (Gonzalez Mem. 20.)  Gonzalez misinterprets the rule.
<u>See</u> <u>Mickens</u>, 535 U.S. at 175 ("Not all attorney conflicts
present comparable difficulties.  Thus, the Federal Rules of
Criminal Procedure treat concurrent representation and prior
representation differently, requiring a trial court to inquire
into the likelihood of conflict whenever jointly charged
defendants are represented by a single attorney (Rule 44(c)),
but not when counsel previously represented another defendant in
a substantially related matter, even where the trial court is
aware of the prior representation." (citing <u>Sullivan</u>, 446 U.S.
346 n.10)).  Moreover, here the Court was not apprised of any
conflict.  (Gonzalez Aff. ¶ 6 (noting that Gonzalez confronted
counsel <u>after</u> the trial and sentencing).)

actual conflict of interest adversely affected his lawyer's performance." Sullivan, 446 U.S. at 350; see also Brien v. United States, 695 F.2d 10, 15 (1st Cir. 1982) ("[T]he conflict must be real, not some attenuated hypothesis having little consequence to the adequacy of representation."). "In cases of 'successive representation, conflicts of interest may arise if the cases are substantially related or if the attorney reveals privileged communications of the former client or otherwise divides his loyalties.'" United States v. Lemieux, 532 F. Supp. 2d 225, 230 (D. Mass. 2008) (quoting Mannhalt v Reed, 847 F.2d 576, 580 (9th Cir 1988)); see also United States v. Lopez, 625 F. Supp. 2d 76, 80 (D.R.I. 2008) (quoting Lemieux). The First Circuit has "require[d] a defendant to show that: (1) the attorney could have pursued a plausible alternative defense strategy and (2) the alternative trial tactic was inherently in conflict with or not pursued due to the attorney's other loyalties or interests." Familia-Consoro v. United States, 160 F.3d 761, 764 (1st Cir. 1998).

Gonzalez argues that counsel's prior representation of Lisa Torres affected his performance at trial, specifically (1) his reluctance to cross-examine the Government's witnesses regarding the wiretap on Waskar Pena's[7] phone, (Mot. 5; Gonzalez Mem. 8, ECF No. 203-1), because any arguments he raised with regard to

---

[7] Waskar Pena was one of Gonzalez's co-defendants.

Torres would be a conflict, (Gonzalez Aff. ¶ 6, ECF No. 203-1); and (2) his failure to call Torres as a defense witness, (Gonzalez Mem. 8). Gonzalez states that the alleged conflict "precluded [counsel] from disclosing and arguing exculpatory evidence to the jury and the Court." (Gonzalez Mem. 18; see also Mot. 5.) Gonzalez further contends that Torres' subsequent indictment for conspiracy, obstruction of justice, and making false statements in an unrelated matter supports his assertions. (Gonzalez Aff. ¶ 7; Gonzalez Mem. 9.) The Government responds that: (1) counsel's representation of Torres occurred nearly ten years prior to Gonzalez's trial; 2) there is no connection between her case and Gonzalez's; and 3) she did not testify at Gonzalez's trial. (Memorandum of Law in Support of Government's Objection to Petitioner's Motion to Vacate, Set Aside, or Otherwise Correct Sentence Pursuant to 28 U.S.C. § 2255 ("Gov't Mem.") 18-19, ECF No. 210.)

First and foremost, Gonzalez cannot show that counsel "actively" represented conflicting interests. Gonzalez does not dispute that Torres was a prior, not current client, of counsel. (Gonzalez Aff. ¶ 6; Mann Aff. 1, ECF No. 227-1.) As the Government notes, and Court records confirm, counsel's last representation of Torres terminated nearly ten years prior to

Gonzalez's trial.[8]  (Gov't Mem. 18.)  Nor does Gonzalez assert,
or provide any evidence, that there was a connection between
Torres' and Gonzalez's cases.  Both Gonzalez and counsel agree
that the conversation regarding the fact that Torres was a
previous client of counsel occurred after sentencing.  (Gonzalez
Aff. ¶ 6; Mann Aff. 1.)  Counsel states that he was unaware of
any conflict during the trial, (Mann Aff. 2), and Gonzalez
states that he was not aware of counsel's alleged conflict of
interest during the trial either, (Petitioner's Reply Mot. to
Gov't Objection ("Gonzalez Reply") 7, ECF No. 214).  Logic
dictates that if counsel was not aware of an alleged actual
conflict during Gonzalez's trial, (Mann Aff. 2), and Gonzalez
did not raise the issue with counsel until after sentencing,
(Gonzalez Aff. ¶ 6; Mann Aff. 1), there could be no effect on
counsel's representation of Gonzalez during the trial.

    With regard to Gonzalez's allegations that counsel failed
to question the Government's witnesses more vigorously due to
his past representation of Torres, the trial transcript belies
Gonzalez's accusations.  Although it is clear from Gonzalez's
synopsis of the taped conversations and his attached exhibits
that Torres is a participant in many of these conversations,
(Gonzalez Mem. 10-14; Gonzales Reply, Ex. L), not once does she

_____

    [8] Court records reflect that counsel last represented Lisa
Torres in April of 1995.

11

refer to Gonzalez by name. In fact, Gonzalez does not appear on any of the tapes, nor is he even mentioned, as counsel elicited at trial. (Tr. I:57:6-11.)[9] Counsel questioned Agent Anthony Cardello regarding the drug trade and the wiretaps. (Tr. I:56:10-I:58:15.) He questioned Special Agent James McCormack regarding, among other things, cellular telephone technology and the use of cell phones in the drug trade. (Tr. II:46:3-II:49:2.) In addition, counsel questioned the Sprint representative, Andrew Arnold, at length regarding cellular telephone technology and records, in particular (based on the records) what constituted a completed call, what did not, and a comparison of Gonzalez's cell phone records with those of Alejandro Pujols.[10] (Tr. II:114:6-II:127:5.) Even if counsel did not question these witnesses as "vigorously" as Gonzalez would have liked, it is unclear what more counsel could have done in this regard. See Phoenix v. Matesanz, 233 F.3d 77, 83 (1st Cir. 2000) ("[C]hoices in emphasis during cross-examination are prototypical examples of unchallegeable strategy.").

Moreover, Gonzalez provides no information regarding what "exculpatory evidence" would have been disclosed or provided

---

[9] "Tr. I:57:6-11" refers to the transcript of the first day of trial, page 57, lines 6-11.

[10] Alejandro Pujols was another of Gonzalez's co-defendants.

absent counsel's alleged conflict.  He argues that the wiretaps and pen registers

> do not inculpate Domingo Gonzalez in any drug transaction or conspiracy.  The conflict of interest precluded Attorney Mann from introducing [sic] the evidence to rebut the presentation being made by the United States and calling Ms. Torres to correct the presumption being presented to the jury by Government Counsel that the phone taps and phone pen-registers somehow incriminated Petitioner.

(Gonzalez Mem. 19.)  Again, however, he fails to indicate what evidence would have been presented.  In short, he has not shown that a plausible alternative strategy existed with regard to counsel's cross-examination of Government witnesses which was not undertaken due to counsel's prior representation of Torres.

As for Gonzalez's claim that counsel should have called Torres as a witness, there is no evidence that counsel did not do so because of any alleged conflict.  Although Gonzalez apparently believes that Torres was a "main player[]" in the conspiracy, (Mot. 5), and describes her as the "'star' witness" against him, (Gonzalez Mem. 8), in fact Torres never testified at Gonzalez's trial, (Gov't Mem. 19).  Counsel states that he "never contemplated calling Ms. Torres as a defense witness." (Mann Aff. 2.)  He added that "to the best of [his] knowledge there was no conflict between [his] representation of Ms. Torres and Mr. Gonzalez as Ms. Torres had no relation to the case against Mr. Gonzalez." (Id.)  Gonzalez asserts that "the prime

defense **strategy** should have been to call the witness who was on the phone wiretap tapes --- to wit, Lisa Torres." (Gonzalez Mem. 37 (bold added).)  However, the decision whether or not to call a particular witness involves a dispute over trial strategy, clearly within counsel's purview, which does not constitute ineffective assistance of counsel.  See Lema, 987 F.2d at 54 ("The decision whether to call a particular witness is almost always strategic, requiring a balancing of the benefits and risks of the anticipated testimony.").  In any event, there is no evidence that counsel did not call Torres because of his alleged past loyalty to her.

Even assuming that calling Torres as a witness was an alternative defense strategy, there is no evidence that such strategy was plausible.  See Familia-Consoro, 160 F.3d at 767 (noting that calling certain witness "would hardly have been a plausible alternative").  One can only speculate as to what Torres would have said on the witness stand or if, in fact, she would have testified at all.  Torres, an "unindicted [sic] 'co-conspirator,'" (Gonzalez Mem. 2), was an initial target of the investigation.  She may have asserted her Fifth Amendment right against self-incrimination.  See Familia-Consoro, 160 F.3d at 767 (finding non-conflict motive where prospective witness not called because potential witness "would likely have asserted the Fifth Amendment privilege against self-incrimination").  She may

have been impeached based on her prior criminal record. (Gov't Mem. 21 n.6.) While it is possible that her testimony may have helped Gonzalez, it is equally possible that it could have hurt his case. See Lema, 987 F.2d at 54 ("The witness may not testify as anticipated, or the witness's demeanor or character may impress the jury unfavorably and taint the jury's perceptions of the accused; or the testimony, though sympathetic, may prompt jurors to draw inferences unfavorable to the accused.") (citation omitted); see also Brien, 695 F.2d at 15 (noting that "the tactics Brien suggests that his attorney could have pursued appear to be merely hypothetical choices").

The Court finds that Gonzalez has failed to show an actual conflict based on counsel's much earlier representation of Lisa Torres. Nor has he demonstrated that counsel failed to pursue a plausible defense strategy due to his alleged loyalty to Torres. Accordingly, Gonzalez's conflict claim fails.

Gonzalez next argues that counsel failed to make a "full and through [sic] investigation of the case prior to going to trial," thereby rendering ineffective assistance. (Gonzalez Mem. 36.) In particular, in his Motion he faults counsel for failing to investigate false evidence, specifically Detective Joseph Colanduono's testimony, or file a motion to suppress that testimony; and failing to investigate wiretaps and/or phone calls before December 8, 2005. (Mot. 7-8; Gonzalez Aff. ¶ 8.)

In his memorandum, Gonzalez additionally alleges that counsel should have investigated whether Torres "was the same Lisa Torres he had previously represented." (Gonzalez Mem. 36.)[11]

The Supreme Court has stated that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Strickland, 466 U.S. at 691. The Court must make this assessment from the perspective of counsel at the time of the judgment, avoiding indulging in hindsight. Id. at 689.

With respect to Colanduono's testimony, Gonzalez alleges that Colanduono testified falsely regarding what he saw. Gonzalez asserts that because of the location of Colanduono's vehicle relative to the Lincoln[12] (in which Gonzalez was a passenger) and the target location, 234 Gallatin Street, Colanduono "could never have seen" what he testified he saw

_____

[11] Any additional arguments regarding failure to investigate are largely duplicative of other arguments already raised and, therefore, need not be addressed separately.

[12] The Lincoln is described as both a Continental and a Town Car. For simplicity, the Court refers to it as the "Lincoln."

Gonzalez and Garcia do after parking the Lincoln. (Gonzalez Mem. 37.)

Colanduono testified[13] in relevant part that he was assigned to a task force with the Drug Enforcement Agency investigating narcotics crimes. On December 11, 2005, he and his partner, Detective Enright, were conducting surveillance of the "target location," which was to be the object of search warrants. They were in an unmarked vehicle parked on Ruskin Street, perpendicular to Gallatin Street and directly across the street from the target location. Colanduono testified that he and his partner had a view of 234 Gallatin Street. Eventually they observed the owner of the residence, Waskar Pena, drive up and park on the street. Pena was followed by a "purplish colored" Lincoln, bearing Massachusetts license plates, which turned into the driveway at 234 Gallatin Street and parked. Colanduono stated that he could see into the Lincoln. He did not believe the windows were tinted. Two Hispanic males, the operator and the passenger, were the only occupants of the vehicle. Colanduono testified that he saw them turn toward the rear of the seat and appear to be manipulating something in the rear

---

[13] Detective Colanduono testified on the first day of Gonzalez's trial. His testimony can be found at Tr. I:82:15-I:116-11. In the interest of brevity, however, the Court does not cite to specific pages and line numbers in its narration of Colanduono's testimony.

17

seat. However, he could not see their hands. After approximately 30-45 seconds, they exited the Lincoln and entered the residence, presumably via the side door.[14] According to Colanduono, it did not appear that Gonzalez was carrying anything. The next time Colanduono saw Gonzalez was while executing the search warrants inside 234 Gallatin Street and securing the premises. Gonzalez was in the basement of the house, being handcuffed by other officers. Thereafter, Colanduono and other officers went outside and inspected the Lincoln. They found a hidden compartment in the rear backing of the passenger seat, as well as a battery and jumper cables. Colanduono testified that the officers were looking for a hidden compartment because that was a way drug dealers transported drugs.[15]

Although Gonzalez asserts in his Motion that he "was not familiar with the 234 Gallatin St. surrounding, he ha[d] no way

---

[14] Gonzalez makes much of the fact that Colanduono initially testified that he saw Gonzalez and Christopher Garcia, the driver of the Lincoln, enter the house from the side door but also testified that he could not see the door. (Gonzalez Mem. 23-24, 27; Tr. I:90:8; Tr. I:110:8.) However, on cross-examination, Colanduono clarified that he assumed that Gonzalez and Garcia entered by way of the side door but that he could not really see. (Tr. I:102:3-5.)

[15] In fact, an undetermined amount of cocaine, a loaded handgun, ammunition, and a scale were found in the hidden compartment, although not by Detective Colanduono. (Tr. II:15:3-4.)

of knowing where Ruskin St. was located or what angle Colanduono might or might not has had [sic] to the Lincoln when he testified at trial," (Mot. 8), Gonzalez states in his memorandum that the Government discovery package included a photograph of the location of Detective Colanduono's vehicle, (Gonzalez Mem. 28-29). Thus, the position of Detective Colanduono's vehicle was not unknown to Gonzalez or counsel. Moreover, counsel cross-examined Colanduono thoroughly regarding, among other things, the location of his surveillance vehicle relative to the Lincoln;[16] whether Colanduono and his partner videotaped or took pictures of what they saw; what Detective Colanduono actually saw Gonzalez do; whether he could see Gonzalez's hands; whether Gonzalez had anything in his hands or was carrying anything when he exited the Lincoln; whether he attempted to obtain fingerprints from either the battery found in the back seat of the Lincoln or the back of the passenger seat; and how much money ($10.00) was in Gonzalez's possession when he was arrested. Counsel also questioned Gonzalez at length regarding his actions when he and Garcia arrived at 234 Gallatin Street and parked in the driveway, as well as Gonzalez's knowledge—or lack thereof—of the presence of a secret compartment, drugs, and a weapon in the vehicle.

---

[16] Gonzalez acknowledges that counsel "subjected Colanduono to a lengthy cross-examination." (Gonzalez Reply 14.)

The jury acquitted Gonzalez on Counts IV and V, the counts related to the drugs and weapon found in the car. (Gonzalez Mem. 6.) While this fact is not determinative of the reasonableness of counsel's decisions, it does attest to counsel's competence in discrediting Colanduono's testimony.

Whether further investigation is necessary is a question left to the discretion of counsel; counsel may make a reasonable decision that makes a particular investigation unnecessary. Strickland, 466 U.S. at 691. As noted previously, a particular decision not to investigate must be assessed for reasonableness considering all the circumstances, according significant deference to counsel's judgments. See id. In the circumstances of this case, the Court concludes that counsel made a reasonable decision that further investigation pertaining to the location of Colanduono's vehicle and his line of sight from that position was not needed.[17] Moreover, there was no prejudice to Gonzalez

---

[17] Gonzalez states that he has "newly discovered evidence" in the form of "Google Earth" photographs of the scene and a private investigator's conclusion that Colanduono could not have seen what he testified he saw Garcia and Gonzalez do before exiting the Lincoln. (Gonzalez Mem. 7; id., Ex. F.) Even if Gonzalez could meet the "cause and prejudice" standard—which is doubtful at best—this evidence is unnecessary as the jury acquitted him on both counts related to items seized from the Lincoln.

Moreover, Gonzalez's statement that Colanduono is "now an indicted drug dealer and alleged perjurer," (Gonzalez Mem. 23), is irrelevant to counsel's decisions during Gonzalez's trial. The same is true with regard to Lisa Torres. See Discussion § A, supra at 10.

because, as noted, he was acquitted on the counts pertaining to the drugs and weapon found in the Lincoln.

Regarding the wiretap and telephone records,[18] Gonzalez states that counsel should have done further investigation of the wiretaps prior to December 8, 2005, and that such investigation "would have show[n] Garcia and Pujol's relationship with Pena more deeply." (Mot. 8.) It is unclear to the Court how showing the relationship between those three men "more deeply" would have helped Gonzalez.[19] It is undisputed that Gonzalez was not heard on the Pena wiretaps produced at

---

[18] Special Agent Anthony Cardello testified regarding the wiretaps at issue. (Tr. I:6:21-I:8:2.) Specifically, he stated that the cell phones tapped both belonged to Waskar Pena. (I:6:25-I:7:1.) Cardello further testified that the wiretap on the first phone was in effect from October 31, 2005, through December 11, 2005 (Tr. I:7:10-13), and that the wiretap on the second was in effect from December 8, 2005, through December 11, 2005, (Tr. I:7:14-24). Pena's cell phones were the only ones tapped. (Tr. I:7:25-I:8:2.) Special Agent James McCormack testified regarding the use of cell phones in drug trafficking. (Tr. I:142:13-I:145:21.) Andrew Arnold, the Sprint representative, brought the customer printout records pursuant to a subpoena. (Tr.II:101:23-II:103:1; Tr. II:106:14-II:107:8.)

[19] It is possible that Gonzalez is referring to his argument that the wiretaps "do not inculpate Domingo Gonzalez in any drug transaction or conspiracy." (Gonzalez Mem. 19.) However, there he is referencing the wiretaps presented at trial, not the wiretaps prior to December 8, 2005. There is no evidence before the Court as to what information may have been on the earlier wiretaps. Accordingly, the Court concludes that Gonzalez is engaging in speculation. See Brien, 695 F.2d at 15 (referring to suggested tactics as "hypothetical choices").

trial, (Gonzalez Mem. 7; Gov't Mem. 27; Tr. I:57:6-8), or even mentioned, (Tr. I:57:9-11).

Again, the Court notes that the matter of investigations is a strategic decision left to counsel. Strickland, 466 U.S. at 691. There is no evidence that further investigation of the Pena wiretaps would have served any purpose. Thus, it is within counsel's ambit to decide whether or not to pursue such investigation, and this Court will not second-guess counsel's strategy. Cf. Phoenix, 233 F.3d at 84 ("Defense counsel is allowed to make strategic decisions, within the wide bounds of professional competence, as to which leads to follow up, and on which areas to focus his energies.").

As to Torres, the Court has already discussed the conflict issue and need not repeat that discussion here, except to make one further point. "The decision to interview potential witnesses, like the decision to present their testimony, must be evaluated in light of whatever trial strategy reasonably competent counsel devised in the context of the particular case." Lema, 987 F.2d at 55 (emphasis in original); see also id. (rejecting argument that strategic considerations should be entitled to little or no deference because counsel failed to investigate potential witnesses' testimony).

Gonzalez has not met the Strickland standard; although he has specified the acts or omissions which he alleges were not

the result of reasonable judgment, he has not shown that "the identified conduct or inaction 'was outside the wide range of professionally competent assistance.'" Manon, 608 F.3d at 131 (quoting Strickland, 466 U.S. at 690); see also Strickland, 466 U.S. at 689 (quoting Michel, 350 U.S. at 101) (noting that defendant "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy'"). The Court, therefore, rejects Gonzalez's ineffective assistance claim as it pertains to counsel's alleged failure to investigate.

B.   False and Misleading Testimony Claim

Gonzalez next claims that the Government knowingly or unknowingly used false evidence at his trial, in violation of his due process rights.[20]   (Mot. 6.)   Specifically, Gonzalez argues:   "1) that the arresting agent[21] falsely testified as to his observations leading up to and at the time of the arrest; and 2) that the Governmetn [sic] Counsel used the wiretap to mislead the jury as to the content and meaning of wiretap transcripts, synopsis, and pen-registers." (Gonzalez Mem. 22.)

---

[20] Gonzalez subsequently avers that the Government's alleged use of false evidence was done knowingly and intentionally. (Gonzalez Mem. 31.)

[21] Although Gonzalez refers to the "arresting agent," (Gonzalez Mem. 22), he is actually referencing Detective Colanduono, as is abundantly clear from Gonzalez's argument.

The "false evidence" to which Gonzalez refers is the testimony of Detective Colanduono. Gonzalez contends that "Colanduono's testimony is completely false and contrary to physical evidence." (Id. at 27.) Gonzalez further argues that "the United States attorney trying this case undoubtedly 'rehearsed' Colanduono's testimony with him and knew exactly what he was going to say." (Id. at 25.) Gonzalez asserts that once Government counsel learned that Colanduono was going to testify "to something that could not be seen, as shown by [the Government's] own discovery materials," the Government's attorney should have averted such testimony. (Id. at 25-26).

As evidence that the Government's attorney knew that Colanduono's testimony was false, Gonzalez states that the Assistant United States Attorney (the "AUSA") knew the position of the Lincoln to which Colanduono was going to testify, that the AUSA had in her possession a videotape showing "that Colanduono was nowhere close to 234 Galla[]tin St.," (id. at 28), and that the AUSA selectively introduced into evidence photographs in the Government's discovery package, (id.). Gonzalez also states that Colanduono's partner "had a better angle of view to the driveway than Colanduono," (id.), and questions the Government's failure to call Enright as a witness.

Even assuming, solely for the sake of argument, that Gonzalez's allegation that Colanduono testified falsely is true,

Gonzalez fails in his attempt to link the Government to said testimony. Gonzales assumes that the AUSA "undoubtedly rehearsed" Colanduono's testimony with him and speculates, but provides no evidence, that the Government knowingly presented false testimony. Id. at 25. That the AUSA may have discussed, even "rehearsed," Colanduono's testimony with him before the trial fails to show, explicitly or implicitly, that the Government was aware that Colanduono would testify untruthfully. Id. In fact, the Government represents that it "believed, and continues to believe, Detective Colandu[o]no's testimony," (Gov't Mem. 22), regarding his observations. The videotape and photographs were provided to Gonzalez as part of the Government's discovery package. Gonzalez states that "[t]he government's failure to call Enright as a witness to colaborate [sic] Colanduono's testimony creates very suspicious circumstance that the prosecutor knew that Colanduono's testimony was false, since Enright had a better angle of view to the driveway." (Gonzalez Mem. 28.) This is pure speculation on Gonzalez's part as there is no evidence in the record as to why the Government did not call Enright.

With regard to the videotape[22] and photographs, what evidence to introduce at trial is clearly a strategic choice

---

[22] A videotape was introduced as a full exhibit and played for the jury on the first day of Gonzalez's trial. (Tr. I:63:2—

which the AUSA is entitled to make, as is the decision whether to call a particular witness to testify. It is certainly not up to Gonzalez to determine how the Government should conduct its case. The Court cannot conclude that the Government knowingly presented false evidence based solely on Gonzalez's allegations.

Turning to the wiretap and phone record/pen register evidence, Gonzalez accuses the Government of attempting to mislead the Court and the jury by misrepresenting what they showed: "This type of prossecution [sic] was continued when the Government introduced the wiretaps and pen registers against Petitioner at trial. They continually mischaracterized them and made references that were not correct nor did the actual exhibits show what was alleged to be there." (Gonzalez Mem. 26.) In short, Gonzalez contends that the Government portrayed as completed calls that were not in order to link him to the conspiracy.

Once more the trial transcript contradicts Gonzalez's contention. The Government presented witnesses who testified in detail regarding cell phone technology, the use of cell phones in drug trafficking, what was indicated in the subscriber records, and, especially, when those records showed completed calls. (Tr. I:142:13-I:145:21; Tr. II:46:10-II:49:2; Tr.

---

I:70:12.) It is unclear whether this is the video to which Gonzalez refers.

II:101:23-II:126:25.)  Records were compared side-by-side.  (Tr. II:107:13-II:126:25.)  Moreover, counsel had the opportunity to cross-examine these witnesses and took full advantage of that opportunity.  (Tr. II:43:9-II:49:2; Tr. II:114:6-II:126:25.)

Noting that he was acquitted on Counts IV and V, Gonzalez states that "the jury felt that the case was a close call, and with a proper defense and evidence would have acquitted on all crimes." (Gonzalez Mem. 21.)  Again, Gonzalez is engaging in speculation as there is no way of knowing what the jury would or would not have done had additional evidence been presented, or existing evidence presented differently.

There is simply no merit to Gonzalez's allegation that the Government knowingly used false evidence at trial or misrepresented wiretap and pen-register evidence.  Gonzalez has provided no evidence which would allow the Court to conclude otherwise.  He has not met the Strickland standard.  Strickland, 466 U.S. at 687, 690.  The Court, therefore, rejects Gonzalez's false and misleading testimony claim.

C.  Insufficient Evidence Claim

Lastly, according to Gonzalez, "[t]he entire premise of Petitioner being involved in the conspiracy and drug sale, is based on what Colanduono claimed to have witnessed and of the wiretaps and pen-registers." (Gonzalez Mem. 26-27.)  Absent Colanduono's testimony and the wiretap and phone records,

27

according to Gonzalez, "there is absolutely nothing on the record that links petitioner to the drug transaction in any fashion, way or manner. . . . Indeed, there is not a single piece of evidence or action whatsoever, that the Government can point out that petitioner did or said in furtherance of the drug conspiracy." (Id. at 38.) Gonzalez asserts that now the "real truth" has been established about Detective Colanduono's testimony and the wiretaps and telephone records. (Mot. 9; Gonzalez Mem. 38.) He therefore requests the Court to reconsider his motion for acquittal, because the Court (and the Government) "explicitly relied on Colanduono's false testimony and on the undeveloped conflicting wiretaps and telephone records" in denying his motion. (Gonzalez Mem. 38.)

On the second day of his trial, after the Government had rested its case-in-chief, Gonzalez's counsel made an oral motion for judgment of acquittal. (See Docket.) The Court denied the motion by oral order that same day. (Id.) Counsel renewed his oral motion for judgment of acquittal after the defense had rested its case and the Government had presented rebuttal evidence. (Id.) District Judge Ernest C. Torres again denied the motion. (Id.) Clearly he was persuaded that there was sufficient evidence to allow the case to go to the jury. Additionally, as evidenced by its conviction of Gonzalez on

Counts I and II,[23] the jury was convinced as to the sufficiency of the evidence against Gonzalez with regard to those counts. Cf. United States v. Woods, 210 F.3d 70, 77 (1st Cir. 2000) (finding "abundant evidence from which a rational jury could infer beyond a reasonable doubt [the defendant's] knowledge that he was purchasing cocaine with intent to sell").

Moreover, Gonzalez's insufficient evidence claim is based on his previous arguments, which the Court has already rejected. Accordingly, the Court finds that Gonzalez's insufficiency of evidence claim lacks merit and declines to revisit the ruling on his motion for judgment of acquittal.

III. Conclusion

Gonzalez has failed to demonstrate that his trial counsel had an actual conflict of interest that affected counsel's performance. Nor has he shown that his counsel's representation fell below an objective standard of reasonableness and that, but for counsel's errors, the result of the proceeding would have been different. Thus, he has not met the Strickland standard. The Court cannot conclude that counsel rendered ineffective assistance. Moreover, Gonzalez has not established that the Government presented perjured testimony or misled the Court and the jury regarding wiretap evidence. Finally, his argument that

---

[23] As noted previously, Gonzalez was acquitted on Counts IV and V.

there was insufficient evidence to support his conviction lacks merit. Therefore, for the foregoing reasons, and for the reasons stated in the Government's memorandum, the instant Motion pursuant to 28 U.S.C. § 2255 is hereby DENIED and DISMISSED.

## RULING ON CERTIFICATE OF APPEALABILITY

Pursuant to Rule 11(a) of the Rules Governing Section 2255 Proceedings in the United States District Courts, this Court hereby finds that this case is <u>not</u> appropriate for the issuance of a certificate of appealability ("COA") because Gonzalez has failed to make a substantial showing of the denial of a constitutional right as to any claim, as required by 28 U.S.C. § 2253(c)(2).

Gonzalez is advised that any motion to reconsider this ruling will not extend the time to file a notice of appeal in this matter. <u>See</u> Rule 11(a), Rules Governing Section 2255 Proceedings.

IT IS SO ORDERED:


_William E. Smith_
William E. Smith
Chief Judge
Date: March 24, 2014